BERNHARD POPKEN ET AL., APPELLEES, V. THE FARMERS MUTUAL HOME INSURANCE COMPANY OF HOOPER, DODGE COUNTY, NEBRASKA, APPELLANT.

142 N. W. 2d 309

Filed April 29, 1966. No. 36158.

Sidner, Gunderson, Svoboda & Schilke, for appellant.

Homer E. Hurt, Jr., and Eugene R. Retz, for appellees.

Heard before CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ., and BURKE, District Judge.

BURKE, District Judge.

Twenty-three Black Angus steers owned by the plaintiffs were drowned in a creek on June 16, 1964.

This action was brought by the plaintiffs against the defendant insurance company under a policy of insurance insuring the steers against "loss or damage by Fire and Lightning, Tornado and Windstorm," but specifically excluding loss or damage by hail, whether accompanied by wind or not. Loss by drowning falls outside the coverage set forth in the contract.

The case was tried to a jury and the jury returned a verdict for the plaintiffs. Judgment was entered thereon.

Defendant appealed from an order overruling its motion for a judgment notwithstanding the verdict, or in the alternative, for a new trial.

The facts, as distinguished from the inferences deducible from the facts, are not in serious dispute.

In the spring of 1964, the plaintiffs, Bernhard Popken and Duane Popken, took 44 head of Angus steers from their farm to a pasture for grazing. The pasture is nearly square in shape and contains 47 acres.

The creek enters the pasture from the northwest corner, angles in a southeasterly direction, and exits near the center of the south border of the property. The creek is one that normally can be stepped across.

There is a large hill near the center of the north border of the pasture which is about 75 feet above the

lowest point in the creek. The west side of the hill rises sharply from the creek. There is also a hill in the southwest corner of the pasture and high ground along the east side of the pasture. The well where the cattle are watered is near the southeast corner of the pasture and is 10 or 15 feet higher than the point where the creek leaves the pasture. There are two valleys running through the pasture from the north which meet and run down to the flat area of the creek. The pasture is fenced with the height of the fence along the south border estimated at 4 feet. Willow trees are located along the creek east of the hill in the southwest corner of the pasture.

Joseph Kaup, called as a witness by the plaintiffs, farms the land directly north of the pasture and there is a common division fence between his land and the plaintiffs' pasture. Approximately 5 minutes before the storm he was working on this fence near the northwest corner of the plaintiffs' pasture at the point where the creek leaves his property and enters the pasture. Mr. Kaup testified that his cattle followed him down to this area and the plaintiffs' cattle all came down to where his cattle were. At this time he testified that the plaintiffs' cattle were: "Right east of the creek on the side hill on the east side." They were still there when he left.

A windstorm of unusual violence occurred minutes thereafter. Mr. Kaup testified that the storm came straight from the north and it sounded "like a couple of freight trains coming." He ran to his basement as he did not believe "there's anybody that would have been able to stand on his feet." The wind came first, then hail followed by a rain that "really poured." It was estimated by Mr. Kaup that the rain started within "one or two minutes" after the wind and hail. The storm lasted 45 minutes.

The windstorm in the immediate area resulted in trees being blown down, limbs being broken from trees, roofs being blown from buildings, sheds collapsing, and a high-

voltage light pole being broken. Approximately 150 feet of fence along the south border of the pasture was washed out by the water.

Immediately after the storm the plaintiffs went to the vicinity of the pasture to look for the cattle. The creek was flooded. Bernhard Popken estimated the depth of the main channel of the creek to be 12 feet and the width of the flood area to be 20 rods. Duane Popken estimated the depth of the water in the creek bed near the willow trees to be 5 or 6 feet and the width of the flood area to be 100 feet. Duane Popken estimated that "probably thirty to forty per cent" of the pasture was flooded.

Four head of cattle were found on a hill in the pasture and the remaining 40 steers were scattered down stream a mile or more south of the pasture. Twenty-three head were drowned.

At the time of the storm, the average weight of the steers was 750 pounds. One surviving steer suffered a slight scratch on its stomach, but otherwise the remaining steers, dead or alive, showed no marks of violence. The hail resulted in crop damage to the area adjoining the pasture and hail was found in the area immediately after the storm.

The plaintiffs rely essentially on the case of Jordan v. Iowa Mutual Tornado Ins. Co., 151 Iowa 73, 130 N. W. 177, Ann. Cas. 1913A 266, in which the court held that a policy insuring against loss of livestock by windstorm, cyclone, or tornado is not limited to loss due to a direct physical injury to the stock as by throwing them to the ground, driving them against some obstacle or hurling some object against them. The court added that if windstorm is the efficient cause of the loss of livestock covered by a policy insuring against loss by windstorm, the fact that other causes may have contributed to that loss does not relieve the insurer from liability.

In the case of Parish v. County Fire Ins. Co., 134 Neb.

563, 279 N. W. 170, 126 A. L. R. 703, we agreed with this as a statement of the law, but distinguished the facts from the case then under consideration.

From the facts set forth above, the plaintiffs contend that it is reasonable to infer that the steers worked to high ground and then the windstorm frightened or drove the steers from the high ground of the hill into the low area of the flooded creek where they were drowned.

In support of this theory, the plaintiffs adduced opinion evidence concerning the reaction of cattle in a storm. Joseph Kaup testified that cattle "kind of start running when you get a wind storm or something." In a wind, he added that cattle "usually work to high ground." When it hails, he stated "they stand in a bunch."

Duane Popken testified that normally "cattle will go with the wind" and "put the wind to their back."

Herb Bergt, who lives in Wayne County, is a cattle feeder of 42 years' experience and runs about 2,500 head of cattle a year. He was called as an expert witness by the defendant and gave his opinions concerning the reaction of cattle in a storm. With respect to hail, he stated that "hail will drift the cattle with the wind. It will probably drift them down along the fence line * * *." With respect to a windstorm, he stated that he had "never seen a wind storm drift cattle," and "They will turn their back to it." In answer to a question concerning the immediate reaction of cattle to wind, hail, and rain coming at them from the direction as described in the evidence, Mr. Bergt stated that it was his opinion that "cattle will not move until this violent rain and hail and wind hit them and they will start to travel with the wind." He then added: "They would drift down as far as the fence and they would stop." It was his opinion that loud noises would not cause the cattle to drift.

The threshold question to be answered is whether there was any evidence to support the verdict.

For the purpose of determining the sufficiency of the evidence to support the verdict, we must consider the

evidence in the light most favorable to the plaintiffs and give the plaintiffs the benefit of all inferences that may reasonably be drawn from the evidence. Mills v. Aetna Ins. Co., 168 Neb. 612, 96 N. W. 2d 721.

The plaintiffs may establish their case by circumstantial evidence as well as by direct evidence.

However, circumstantial evidence is not sufficient to sustain a verdict depending solely thereon for support, unless the circumstances proved by the evidence are of such nature and so related to each other that the conclusion reached by the jury is the only one that can fairly and reasonably be drawn therefrom. Mullikin v. Pedersen, 161 Neb. 22, 71 N. W. 2d 485.

The evidence must be such as to make the plaintiffs' theory of causation reasonably probable, not merely possible.

In every case, before the evidence is submitted to the jury, there is a preliminary question for the court to decide, when properly raised, not whether there is literally no evidence, but whether there is any evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. Weston v. Gold & Co., 167 Neb. 692, 94 N. W. 2d 380.

Where several inferences are deducible from the facts presented, which inferences are opposed to each other, but equally consistent with the facts proved, the plaintiffs do not sustain their position by a reliance alone on the inferences which would entitle them to recover. Shamblen v. Great Lakes Pipe Line Co., 158 Neb. 752, 64 N. W. 2d 728.

Conjecture, speculation, or choice of quantitative possibilities are not proof. There must be something more which would lead a reasoning mind to one conclusion rather than to the other.

If, as plaintiffs contend, inferences may be fairly and reasonably drawn from the evidence that the cattle worked their way to high ground, and the windstorm

frightened or drove them from the high ground of the hill into the low area of the flooded creek where they were drowned, equally justifiable inferences, consistent with the facts proved and inconsistent with the plaintiffs' right to recovery, may be fairly and reasonably drawn that the steers were within the flood plain of the creek when the storm commenced, remained in the flood plain during the storm, and were eventually swept downstream and drowned.

In short, the proven facts go no further than to give equal support to at least two inconsistent inferences and the judgment must go against the parties upon whom rests the burden of proof.

The judgment of the trial court is reversed and the cause is remanded to render judgment notwithstanding the verdict in favor of the defendant.

REVERSED AND REMANDED WITH DIRECTIONS.